The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award except for minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. At the time of the accident, the defendant was self-insured with Constitution State Service Company as the adjuster.
3. The employee-employer relationship existed between the parties.
4. The plaintiffs average weekly wage was $315.20, yielding a compensation rate of $210.14 per week.
5. The date of the alleged injury was 16 November 1993.
6. The nature of the injury was back injury.
7. The plaintiff last worked for the defendant on 16 November 1995, at which time she was laid off in connection with the closing of the plant.
8. The plaintiffs medical records were stipulated and received into evidence as Stipulated Exhibit 1. The four doctors depositions were stipulated and received into evidence.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. The plaintiff, age 51 at the time of the hearing before the Deputy Commissioner, is a high school graduate. She previously worked as a hair-dresser for approximately eight years, as a physical fitness consultant for approximately ten years, as a housekeeper for approximately six months, and then as a fitness consultant again for seven years.
2. The plaintiff began working for the defendant on 19 October 1987 as a "close sleeve operator, which is a production job sewing sweatshirts. The plaintiff continued her work as a fitness consultant and taught aerobics classes at night while employed with the defendant.
3. Prior to 6 November 1993, the plaintiff had no back problems.
4. On 6 November 1993, the plaintiff sustained an injury by accident arising out of and in the course of her employment with the defendant when she fell off a platform at work and struck her back. The plaintiff continued to work her regular job until January 1994.
5. The plaintiff began treating with Dr. Todd M. Chapman at Miller Orthopedic Clinic on 5 January 1994 with complaints of pain and numbness in her left buttock area and down her left leg. Dr. Chapman initially diagnosed the plaintiff with a contusion of her gluteus maximus and her cluneal nerves over the iliac crest area. Dr. Chapman subsequently diagnosed the plaintiff with lumbar strain. Dr. Chapman treated her conservatively.
6. Based upon the plaintiffs continued complaints of pain in her low back, left leg and occasionally her left hip, Dr. Chapman ordered a CT scan of the lumbar spine which was taken on 18 April 1995. It did not reveal any significant neuro-compressive lesions. On 2 May 1995, the plaintiff returned to Dr. Chapman reporting that a muscle stimulator recently prescribed was helping her back pain and that she had not had anymore sharp pains. She was still complaining of numbness in her leg after sitting or standing for a long time. Dr. Chapman found the plaintiff to have reached maximum medical improvement and released her from his care with a five percent permanent partial impairment to her spine. He released her to work at a sitting job with a thirty-five pound lifting restriction.
7. As a result of her restrictions, in May of 1995, the plaintiff was transferred to the position of "band bottom worker with the defendant, which was a light duty job.
8. On 18 July 1995, the plaintiff returned to Dr. Chapman to get a new prescription. At that time, she had forward flexion with fingertips to the floor, excellent extension and negative SLR. The plaintiff did, however, report continuing numbness in her left buttock area. Dr. Chapman opined that the plaintiff had a contusion in that area that would improve.
9. On or about 4 October 1995, the plaintiff signed the Form 26 agreement agreeing to the rating of five percent permanent partial disability to her back. The Form 26 was approved by the Industrial Commission on 22 February 1996.
10. The plaintiff continued to work full-time for the defendant until the plant closed in November 1995.
11. On 12 December 1995, the plaintiff returned to Dr. Chapman with complaints of pain in the left buttock and left posterior thigh. Dr. Chapman ordered an S1 nerve root block. When the plaintiff returned to Dr. Chapman on 5 January 1996, her symptoms had improved. When she last saw Dr. Chapman on 19 February 1996, she was "getting along fine and had only needed three or four pain pills since the January visit. Dr. Chapman released her to return as needed.
12. After the plant closed, the plaintiff was unable to find employment within her permanent restrictions. She worked one day at a Manpower job and one day at a doctors office. During 1996 until approximately March of 1997, at the expense of the defendant, the plaintiff returned to school to become a licensed practical nurse.
13. The plaintiffs condition began to deteriorate due to increasing and continuing back and left leg pain. She began to cry out in pain in the middle of the night. Her left leg began to give out. She began just sitting around the house. Her complaints of pain increased and she began to tell her husband that she would rather die that live with the pain. By approximately March 1997, due to her increasing pain, she could not sit in class and had to drop out of school. She only completed the first year of the two-year program.
14. On 13 February 1997, the plaintiff returned to Miller Orthopedic Clinic and, because Dr. Chapman had left the practice, was seen by Dr. John A. Welshofer, a specialist in physical medicine and rehabilitation. The plaintiff was complaining of "miserable back pain and intermittent pain down her left leg. Dr. Welshofers impression on that date was degenerative disc disease with intermittent left sciatica. He did not give plaintiff any work restrictions because she was not working. He referred her for a CT myelogram which revealed a fairly large herniated disk between T12 and L1 on the left with possible compression on the left T12 nerve root. After further questioning by Dr. Welshofer, the plaintiff reported having pain progression towards her umbilicus region on the left side.
15. On 6 March 1997, after reviewing the results of the CT myelogram, Dr. Welshofer could not conclude whether the T12-L1 herniation was causing the plaintiffs symptoms, so he order a T12 selective epidural. On 27 March 1997, Dr. Welshofer found that the plaintiff reported a seventy-five percent improvement in her pain after the selective T12 epidural. Despite this report and despite the plaintiffs report of back pain around her umbilicus region on the left side, Dr. Welshofers impression was that the T12-L1 disk herniation was not producing her pain. He therefore referred her to Dr. Craig Brigham for evaluation.
16. Due to the pain relief the plaintiff received with the epidural, the plaintiff was able to work four or five weekends as a nursing assistant at a nursing home. However, after the epidural wore off, her pain again returned and she was therefore unable to do the work and she resigned.
17. Dr. Brigham, an orthopedic surgeon, examined the plaintiff on 17 April 1997 upon referral of Dr. Welshofer. He recommended no surgery at that time for the herniated disc and recommended no change from Dr. Chapmans five percent permanent partial disability rating. Dr. Brigham found that the herniated disk was most likely the result of her 16 November 1993 injury by accident but had gone unrecognized. Although he stated that he did not know if her complaints of pain were consistent or related to the herniated disk, he found that they possibly could be. Further, he indicated that if she continued to have pain clearly attributable to the T12-L1 disk in that it would wrap around the anterior part of her abdominal region and radiate down the left side as before, she might be a candidate for a microdiscectomy.
18. Having reviewed Dr. Chapmans notes, Dr. Brigham opined that although the plaintiffs condition had not changed from an objective standpoint since February 1996, he did admit that since the plaintiff was released by Dr. Chapman in stable condition and subsequently her pain increased to a point that necessitated an epidural injection, she could have sustained a change in condition.
19. The plaintiff continued to have back and left leg pain and was treated in the emergency room at Cleveland Regional Medical Center on 12 September 1997. She subsequently received approximately three weeks of physical therapy at Cleveland Medical Center in September 1997 for her pain.
20. The plaintiffs pain got so bad that she wanted to die. She felt her whole body was deteriorating mentally and physically. At that point, she went to see her attorney, who referred her to Dr. Richard C. Avioli, an orthopedic surgeon.
21. Dr. Avioli saw the plaintiff on 15 October 1997 and 19 December 1997. Dr. Avioli found that the plaintiffs back pain, radiating left leg pain and burning pain in the abdominal area were consistent with the T12-L1 disc herniation. The fact that the plaintiff received pain relief after the T12 epidural and then a return of pain after the epidural wore off confirmed, to a reasonable degree of medical certainty, that the plaintiffs continued back and left leg pain was a result of the herniated disc. A review of the prior medical records, along with Dr. Aviolis examination of the plaintiff, established by the greater weight of the evidence and the Commission finds that the herniated disc was caused by the 6 November 1993 injury by accident. Dr. Avioli recommended surgery and referred her to a neurosurgeon.
22. After reviewing the medical notes from Miller Orthopedic Clinic, Dr. Avioli explained that the herniated disc was not discovered earlier because the CT scan taken at Miller Orthopedic Clinic in April 1995 covered only the area from L3-S1 and did not go far enough. Dr. Avioli did not know why the doctors at Miller Orthopedic Clinic released the plaintiff with a disability rating even after the herniated disc was discovered and after the plaintiff received relief from the epidural.
23. Dr. Avioli noted that the plaintiffs complaints of left leg pain and back pain were consistent since the accident, but the severity had waxed and waned. He noted that in such a situation with an untreated herniated disc, her pain could have worsened since the accident. Subsequent to the accident, Dr. Avioli would have put the plaintiff on light duty or possibly taken her out of work.
24. Upon referral by Dr. Avioli, Dr. Gudeman sent the plaintiff for physical therapy. Plaintiff received conservative treatment until March of 1998. Her condition did not improve.
25. The plaintiff was seen by Dr. Raymond Sweet on 15 March 1998. He agreed with Dr. Aviolis assessment and recommended a discectomy and hemi-laminectomy at T12-L1. Dr. Sweet performed the surgery on 9 April 1998. After the surgery, the plaintiffs leg and abdominal pain were gone and she had minimal back pain. She had not reached maximum medical improvement when the record was closed before the Deputy Commissioner.
26. The plaintiffs continuing back and left leg pain was caused by the herniated disc at T12-L1, which was causally related to the 16 November 1993 injury by accident. The plaintiff had this pain for five years before she finally received surgery in April 1998. She managed to work light duty through November 1995 when the plant closed, and although she was unable to find work within her restrictions, she was able to attend school during 1996 through approximately March 1997. The plaintiff did not treat at Miller Orthopedic Clinic between February 1996 and February 1997. However, by March of 1997, her pain had increased and had become so debilitating that she was no longer able to attend classes, and the Commission finds that she was unable to work. She returned to Miller Orthopedic in February 1997, and in March of 1997, her complaints necessitated that she receive an epidural.
27. By March of 1997, the plaintiffs increase in pain became so debilitating that she was no longer able to work or earn wages in even light duty employment as she had been in 1995 when the Form 26 was signed or in early 1996 when she presumably received her last compensation payments. From 1 March 1997 through at least the time of the medical depositions in this matter, the plaintiff was unable to earn wages with the defendant or in any employment with the exception of the weekends she worked for the nursing home in March and April 1997 after her epidural.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The plaintiffs herniated disc at T12-L1 was caused by her compensable injury by accident of 16 November 1993. N.C.G.S.97-2(6).
2. By 1 March 1997, the plaintiffs pain had increased and was of such a debilitating nature that she was no longer able to earn any wages as she had been able to do at the time she received her last compensation payment pursuant to the Form 26 agreement. Plaintiffs degree of disability increased and her earning capacity decreased due to the increase in pain, thus constituting a change of condition. N.C.G.S. 97-47; Blair v. American Television Communications Corp., 124 N.C. App. 420, 477 S.E.2d 190 (1996);Lucas v. Bunn Manuf. Co., 90 N.C. App. 401, 368 S.E.2d 386
(1988).
3. Due to the compensable injury by accident and her subsequent change of condition, the plaintiff has been temporarily and totally disabled since 1 March 1997 with the exception of the few weekends she worked at a nursing home in March and April 1997, and she is entitled to compensation at the weekly rate of $210.14 since 1 March 1997, with the exception of the time she worked. N.C.G.S. 97-29.
4. The plaintiff is entitled to have the defendant provide all medical compensation arising from her injury by accident for her lifetime, including all treatment for her herniated disc at T12-L1. N.C.G.S. 97-2(19), -25; Hyler v. GTE Products Co.,333 N.C. 258, 425 S.E.2d 698 (1993).
5. At such time as she reaches maximum medical improvement, the plaintiff shall be entitled to a review to determine if she is due any additional compensation for permanent partial disability. N.C.G.S. 97-47.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendant shall pay temporary total disability compensation to the plaintiff at the weekly rate of $210.14 for the period beginning 1 March 1997 and continuing until the plaintiff returns to work or until further order of the Industrial Commission. The compensation that has accrued shall be paid in a lump sum to the plaintiff, subject to a credit for unemployment benefits and subject to the attorney fee approved below.
2. The defendant shall pay all medical compensation arising from this injury by accident, including those medical costs relating to her herniated disc at T12-L1 and surgery.
3. An attorney fee in the amount of twenty-five percent is approved for the plaintiffs attorney, said amount to be deducted from the lump sum amount due to the plaintiff under this Opinion and Award and paid directly to her attorney by the defendant. Thereafter, the defendant shall pay every fourth compensation check directly to the plaintiffs attorney.
4. The defendant shall pay the costs.
This the ___ day of September 1999.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
LKM/bjp